## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| BARBARA WATSON and QUIANA CARSON, individually and on behalf of all others similarly situated, | **Civil Action No.:** |
| Plaintiffs, | **COMPLAINT FOR DAMAGES** |
| v. | |
| BIO-LAB INC.; KIK CONSUMER PRODUCTS, INC. | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiffs Barbara Watson and Quiana Carson, individually and on behalf of all others similarly situated, bring this class action complaint against Defendants Bio-Lab Inc. and KIK Consumer Products, Inc. (together "KIK Bio-Lab"). On personal knowledge of their own circumstances and upon investigation and information and belief of their counsel, Plaintiffs allege the following:

### NATURE OF THE ACTION

1.     In the early hours of September 29, 2024, a chemical fire erupted at the KIK Bio-Lab Facility in Conyers, Georgia.

2.     The fire began when water from the facility's malfunctioning sprinklers leaked onto Bio-Lab's exposed chemicals, triggering an explosive chemical reaction that spewed massive plumes of toxic gas into the air and ignited nearby combustibles.

3.     Firefighters rushed to the scene, but the water-reactive chemicals stymied their ability to subdue the flames. Although the initial fire was contained in the morning, it reignited later that afternoon, augmenting the wall of toxic gas that poured out from the Bio-Lab facility.

4.     The gaseous cloud – laced with caustic chemicals like chlorine, hydrochloric acid, hydrogen cyanide, hydrogen bromide and phosgene – blanketed the city of Conyers and surged across Rockdale County and neighboring counties, causing hazardous conditions outdoors and seeping into residents' homes through ventilation systems and into the cars of commuters who were stuck on the highway.

5.     Even low levels of exposure to these toxic chemicals can result in severe acute and latent injuries. Just a few breaths of chlorine gas can damage a person's upper and lower respiratory tract and have long-lasting impacts on lung capacity.[1]

6.     In response to this health emergency, at around 1:00pm on September 29th, the Rockdale County government issued an evacuation order, mandating residents of Conyers flee the area. More than 17,000 people were forced to evacuate their homes because of the Bio-Lab eruption. Toxic smoke billowed across highways that were jammed with vehicle traffic.

7.     Additionally, all residents of Rockdale County—90,000 in total—were placed under an immediate shelter-in-place order and given instructions to turn off their air conditioning units and ventilation systems to avoid drawing in the contaminated air.

8.     Thousands of Rockdale residents remain indefinitely trapped inside their homes during certain hours of the day. The Rockdale Emergency Management Agency recommended that residents continue to shelter in place between the hours of 7pm and 7am through at least

---

[1] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3136961/

Friday, October 4th, citing fears that "air quality readings may dip to concerning levels for those in direct exposure to the plume."[2] There is no telling how long this health emergency will persist.

9.     Officials expect that the putrid plumes of smoke will linger for days or longer. Residents of neighboring counties – from Gwinnet to Newton to Dekalb – have reported hazy skies and the odor of chlorine.[3]

10.     This is not the first incident at the Conyers Bio-Lab facility. Similar chemical-reaction induced explosions occurred in 2020, 2016, and 2004.

11.     The Conyers Bio-Lab facility has exhibited a pattern and practice of negligence, endangering the health, safety, and peace of mind of the residents of Rockdale, Georgia and the surrounding areas.

12.     Plaintiff Quiana Carson resides in Conyers, Georgia, approximately 1 mile from the Defendants' Conyers facility. Plaintiff Barbara Watson resides in Covington, Georgia, approximately 18 miles from the Defendants' Conyers facility.  Both Plaintiffs had to take actions and suffered damages as a result of the chemical fire that erupted at the KIK Bio-Lab Facility in Conyers, Georgia.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this action is a class action in which the matter in controversy exceeds

---

[2] https://www.rockdalecountyga.gov/updates-on-bio-fire-9-29-24/

[3] Gwinnett County on X (formerly Twitter): "We've received calls from residents in parts of the county reporting haze and a chemical smell believed to be related to the BioLab chemical plant fire in Rockdale County." / X; Schools Closed Monday, September 30 - Newton County Schools; Rockdale chemical plant fire: How school districts, colleges are changing outdoor plans – WSB-TV Channel 2 - Atlanta (https://www.wsbtv.com/news/local/gwinnett-county/gwinnett-county-schools-cancels-outdoor-activities/PZ5OY6ZYAND7HF7QA3HKKLTZUI/).

$5,000,000 exclusive of interest and costs, and members of the putative classes are citizens of states that are different from the states of which Defendants are citizens

13.     This Court has jurisdiction over Defendants because they each operate their chemical enterprise in this District. Through their regular business operations in this District, Defendants intentionally and regularly availed themselves of the markets and jurisdiction in this District, conferring this Court with personal jurisdiction over each Defendant.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to Plaintiffs' and the Class Members' claims occurred in this District, and Defendants are subject to the Court's personal jurisdiction.

**PARTIES**

15.     At all times material hereto, Plaintiff Barbara Watson is and was a *sui* juris resident of Covington, Newton County, Georgia.

16.     At all times material hereto, Plaintiff Quiana Carson is and was a *sui* juris resident of Conyers, Rockdale County, Georgia.

17.     Defendant Bio-Lab, Inc. ("BioLab") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business located at 101 MacIntosh Boulevard, Concord, Ontario, L4K4R5. At all times relevant to this Complaint, BioLab has transacted business in this District and throughout the United States.

18.     Defendant KIK Consumer Products, Inc. ("KIK") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business located at 101 MacIntosh Boulevard, Concord, Ontario, L4K4R5. At all times relevant to this Complaint, KIK has transacted business in this District and throughout the United States.

19.     Defendant BioLab is a wholly owned subsidiary of Defendant KIK, and since at least 2014, KIK has exercised complete control over BioLab's operations.

## STATEMENT OF FACTS

### The Conyers BioLab Chemical Facility

20.     BioLab is a large-scale commercial manufacturer of water treatment products. It opened its facility in Conyers, Georgia in 1973.

21.     BioLab was acquired by KIK Consumer Products in 2014, and BioLab now operates as the "swimming pool and spa water care division of KIK Consumer Products."[4]

22.     Among other activities, the Conyers BioLab facility receives and stores chemicals including Trichloroisocyanuric Acid ("TCCA"), calcium hypochlorite, and dichloroisocyanuric acid. It then packages these chemicals into finished consumer products.

23.     TCCA is chlorinating agent used to sanitize swimming pools and hot tubs. The chemical can exist in several physical forms: as a powder, in compacted tablets, and in granules.

24.     When TCCA is added into a large body of water, such as a pool or hot tub, the chemical dissolves and decomposes into hypochlorous acid (HClO) – the sanitizing agent that kills bacteria and other microorganisms. For this chemical reaction to occur safely and slowly, it is critical that the TCCA is *added into* a substantial volume of water.

25.     By contrast, when small amounts of water are added to TCCA (for example, a sprinkler dripping onto exposed TCCA pellets) an exothermic chemical reaction occurs instead; a burst of heat energy is released, and TCCA violently combusts into chlorine gas and nitrogen trichloride.

---

[4] https://www.biolabinc.com/

26.     Other chemicals stored and used in Biolab's manufacturing processes are similarly combustible.

27.     It is widely known that, under certain conditions, water-reactive chemicals like TCCA and other chemicals used by Defendants at the BioLab facility can cause or accelerate combustion, ignite nearby combustibles, and result in a fire that will burn until the fuel is completely consumed.

28.     At any given time, the Conyers facility is stocked with hundreds of pounds of TCCA and similar chemicals.

29.     Some of these chemicals are stored in "super sacks" – enormous packages, weighing upwards of 2,750 pounds, piled onto the warehouse floors.

30.     Safety sheets for TCCA indicate that it is a hazardous substance and should be stored in tightly closed containers. The safety sheets also warn that TCCA produces "Hazardous combustion products," including carbon oxides, nitrogen oxides, and chlorine gas. The sheets instruct product users to "[t]ake any precaution to avoid mixing with combustibles," and "[a]void breathing dust/fume/gas/mist/vapors/spray."

31.     Despite the well-established risks associated with the storage and use of TCCA, Defendants have a multi-decade history of negligently and recklessly handling chemicals at the Conyers facility, causing at least three prior mass harm events and incurring a slew of regulatory violations. As such, they knew or should have known of the dangers of exposing TCCA to even small amounts of water and handled chemicals at the facility in a manner to prevent such interactions.

*BioLab's Hazardous Past: A "Known Problem" Left Unaddressed*

32.     Since at least 2004, Defendants' track record of negligently handling its chemicals and its apathetic approach to resolving known problems has caused serious physical and emotional harm to thousands of residents of Rockdale County, and their surrounding environment.[5]

The 2004 Fire

33.     At approximately 4:30 on May 25, 2004, Building Number 14 of the Conyers BioLab facility caught fire. At the time, estimates indicate that there were approximately 15 million pounds of toxic chemicals, including calcium hypochlorite, trichloroisocyanuric acid, and dichloroisocyanuric acid, at the warehouse.

34.     The warehouse burned in an uncontrollable inferno from May 25 through the evening of May 26, 2004, releasing massive plumes of toxic gas into the air. Rockdale County Sheriff and Conyers Police Departments ordered an evacuation of all people within a one-mile radius of the fire, displacing thousands from their homes and shutting down businesses across Conyers.

35.     The prevailing northeastern winds carried this toxic cloud at least 45 miles from the BioLab facility, spreading the dangerous smoke through Rockdale, Newton, Walton, Morgan, Greene and Putnam Counties. And for several months thereafter, the wreckage of the warehouse continued to off-gas toxic fumes into the air.

36.     According to EPA, runoff from the site transported toxic chemicals into the ground, streams and water table. More than 12.5 million pounds of chlorine drained into the nearby VFW lake, resulting in catastrophic damage to the ecosystem and massive marine death.[6]

---

[5] https://www.vox.com/climate/374950/georgia-chemical-plant-fire-biolab-conyers-atlanta-chlorine
[6] https://www.epaosc.org/site/site_profile.aspx?site_id=A4EY;
https://atlanta.capitalbnews.org/biolab-fire-black-residents-conyers-georgia/

The 2016 Fire

37.    In 2016, the Rockdale County Fire Department responded to another smoke plume emanating from the Conyers BioLab facility.

38.    An investigation uncovered two pails containing 15-20 pounds of trichlorisocyanuric acid that had begun to decompose and smoke. While the fire department attempted to use BioLab's aqueous firefighting foam cannon, the application was "ineffective due to raw materials stored in the west side of the shed, which blocked the stream of the foam."[7]

39.    It took several hours and more than 2,000 gallons of water to contain the burn.

The 2019 Hazardous Waste Violations from the Georgia Environmental Protection Division

40.    In 2019, the Georgia Environmental Protection Division responded to a hazardous waste complaint at the Conyers BioLab facility. The inspection found that the BioLab facility was in violation of certain fire safety standards – namely, that there was "inadequate space" between drums of chemicals to "allow unobstructed movement of fire protection equipment, spill control equipment and decontamination equipment."[8]

The 2020 Fires

41.    On September 14, 2020, the BioLab facility caused yet another chemical eruption.

42.    Overnight, a water line leaked and flooded 75% of the Conyers BioLab facility. When workers arrived onsite in the morning, they observed TCCA powder loose on the floor, mixing with the floodwaters. Employees knew this would cause a chemical reaction.

43.    Indeed, as toxic smoke began to emanate from the reacting chemicals, the employees attempted to move the still-stable packages of TCCA away from the combustion zone to stop the spread – but the slippery conditions made it unsafe to execute these rescue operations.

_____

[7] Complaint ID 79996 - Complaint Tracking System (gaepd.org)
[8] https://cts.gaepd.org/Complaint/Attachment/3ea6b9aa-b59b-4bf2-8137-1c0d099db03e/Bio-Lab%20NOV-CSL%20FCI%20Insp%20Rpt.pdf

44.     The thermal decomposition reaction of TCCA generated a massive plume of toxic smoke, which spread outwards from the BioLab facility and into the Rockdale community.

45.     Nine firefighters responding to the incident were hospitalized. All BioLab employees responding to the incident were exposed to dangerous chemical fumes. And the caustic smoke shut down parts of the highway for over six hours.

46.     Local businesses in the vicinity were instructed to evacuate, and residents were encouraged to shelter in place.[9]

47.     The U.S. Chemical Safety and Hazard Investigation Board released a report on the incident, finding it caused more than $1 million in damage.[10]

48.     The Rockdale County Fire Department report found that the rescue effort was hindered because the pallets of decomposing chemicals were trapped by poorly stacked pallets of materials.

49.     As part of the cleanup efforts from the September 14, 2020 fire, BioLab employees relocated some of the unaffected TCCA inventory into trailers near to the warehouse.

50.     Four days later, on September 18, 2020, another thermal decomposition ignited the TCCA inside those trailers, which burst into flames. Officials suspect the TCCA loaded into the trailers had gotten wet or heated during the September 14th event, igniting the reaction.

51.     Either way, BioLab's personnel knew or should have known, based on experience and common knowledge regarding TCCA, that TCCA should not be permitted to get wet or remain wet. Yet BioLab's personnel failed to learn or heed this lesson, which ultimately caused the massive chemical fire that is causing harm and dislocation today.

---

[9] Conyers Georgia chemical fire: BioLab had similar incident 2004 | 11alive.com
[10] Georgia BioLab plant fire sparks evacuations after plume releases chlorine - The Washington Post

Biolab's Bad Practices Across America

52.     BioLab's reckless and negligent practices are not limited to its Conyers facility.

53.     For example, on August 27, 2020, the same TCCA decomposition reaction caused an explosion at the Lake Charles BioLab facility in Westlake, Louisiana.

54.     The U.S. Chemical Safety and Hazard Investigation Board released a report on that incident, finding that "Bio-Lab experienced serious delays in responding to the TCCA-based formulation decomposition and fire due to an inadequate and largely nonfunctional fire protection system and the absence of automated sprinkler systems. The approximately five-and-a-half hour delay in responding to the decomposition likely led to an unnecessary increase in (1) the amount of TCCA-based formulation that decomposed, (2) the quantity of toxic chlorine released, and (3) the extent of the facility damage."[11]

55.     Despite these repeated catastrophic system failures, Defendants have apathetically and negligently failed to alter their business practices. Each incident has left a footprint of suffering in Rockdale – and these steps led to the September 29, 2024 fire.

**The September 2024 BioLab Explosion**

56.     At roughly 5:00 a.m. on the morning of September 29, 2024, yet another chemical reaction caused an explosion at the Conyers BioLab facility.

57.     Rockdale's Fire Chief reported that the reaction was caused by BioLab's malfunctioning sprinkler head, which leaked onto the facility's water-reactive chemicals, including TCCA.[12]

---

[11] See US Chemical Safety and Hazard Identification Board, *Investigation Report: Chemical Reaction, Decomposition, and Toxic Gas Release at Bio-Lab, Inc.*(April 24, 2023), available for download at Bio Lab Conyers Chemical Release | CSB
[12] Shelter-in-place order for 90,000 Georgia residents lifted after chemical fire | AP News

58.     The combustion reaction sent massive plumes of thick, toxic smoke into the air and surging outward from the facility into the surrounding community.

59.     The gas plume, which was laced with caustic chemicals including chlorine, hydrochloric acid, hydrogen cyanide, hydrogen bromide and phosgene, billowed across Rockdale County and was swept into neighboring counties by the prevailing winds.

60.     Over 17,000 people in Conyers were abruptly ordered to evacuate their homes, as the toxic gas clouds covered the city.

61.     Another 90,000 people across Rockdale County were ordered to shelter in place and instructed not to turn on their air conditioning or ventilation units to avoid pulling contaminated air into their homes.

62.     Rockdale and other neighboring counties were forced to shut down schools to protect students' health. Likewise, the Rockdale County government facilities were preemptively shuttered for the entire week.[13] As of the time of this filing, the Rockdale County School Superintendent, Dr. Terry Oatts, has extended precautions and the school system will be on virtual learning at least through Wednesday, October 9th.[14]

63.     As the plume of toxic chemicals fanned outwards from its epicenter in Conyers, residents from neighboring Gwinnet, Newton and Dekalb Counties reported hazy skies and the strong odor of pool chemicals permeating the air.[15]

---

[13] The Georgia chemical fire, explained: Why chlorine is in the air and what to do about it | Vox

[14] https://www.wsbtv.com/news/local/rockdale-county/biolab-fire-rockdale-superintendent-explains-decision-go-virtual-learning-next-week/T3N4LLOC7JAYFKI456W25DNZWM/

[15] Gwinnett County on X: "We've received calls from residents in parts of the county reporting haze and a chemical smell believed to be related to the BioLab chemical plant fire in Rockdale County." / X; Schools Closed Monday, September 30 - Newton County Schools; Rockdale chemical plant fire: How school districts, colleges are changing outdoor plans – WSB-TV Channel 2 - Atlanta (wsbtv.com)

64.     As a result of the explosion at the Conyers BioLab facility, Plaintiffs and other residents of the surrounding area were exposed to these toxic chemicals, and continue to be exposed to these chemicals.

65.     Plaintiff Quiana Carson has already suffered health consequences as a result of the toxic chemicals in the air surrounding her home.  Plaintiff Carson has asthma, which has been severely inflamed by the toxins in the air, and earlier this week sought medical care as a result of the coughing and difficulty breathing she has experienced.

66.     Plaintiff Barbara Watson is a paraprofessional with the Newton County school system, one of the many school systems impacted by the toxic chemicals circulating in the air. Newton County schools were closed September 30th and October 1st, and had a delayed start on October 3rd.  Even after their return, Plaintiff Watson and her colleagues were advised to do inside recess for the safety of students and staff.

67.     After the initial fires were contained, Rockdale's Fire Chief Marian McDaniel told the press "[n]othing that we can do or will be done to make this product any worse than it already is."[16] She warned that smoke may linger for several days.

68.     As of this filing, approximately 90,000 residents of Rockdale County are still under orders from Rockdale Emergency Management to shelter in place from 7pm to 7am, during which time "air quality readings may dip to concerning levels" due to weather and inversion in the evenings. Residents are advised to keep their windows and doors closed, and to turn off any HVAC or other systems that may draw in the toxic air.[17]

---

[16] The Georgia chemical fire, explained: Why chlorine is in the air and what to do about it | Vox
[17] UPDATES ON BIO FIRE (9/29/24- 10/2/2024) - Rockdale County - Georgia (rockdalecountyga.gov)

69.     On October 2nd – three days after the initial eruption – Georgia Emergency Management reported that air quality monitors near the BioLab facility had detected chlorine levels exceeding relevant safety thresholds overnight.[18]

70.     Health officials warn that exposure to the toxic smoke can cause acute symptoms including eye and airway irritation, coughing, shortness of breath, chest discomfort, headaches, inhalation issues, and upper respiratory problems.[19] People with pre-existing conditions such as heart disease or asthma, like Plaintiff Carson, are at risk of facing more severe health consequences, including chest pain or difficulty breathing.

71.     Moreover, these health threats don't dissipate with the smoke. Exposure to caustic chemicals can have latent health effects including the "development of chronic lung problems, including bronchitis and asthma, and even some cancers. Even a short, single exposure to high concentrations of chlorine can cause immediate lung damage, which could be irreparable."[20]

72.     Dr. Andrew Whelton of Purdue University stressed that residents should consider in-home testing of their carpet, walls, and soil, which can trap toxins, resulting in lingering and repeated exposure.[21]

73.     The toxic chemicals released by Defendants will also cause irreparable harm to the environment, poisoning nearby waterbodies and seeping into the soils.

---

[18] BioLab fire: Overnight chlorine spike, Atlanta residents warned of haze and odor | FOX 5 Atlanta
[19] Conyers Georgia BioLab chemical fire: What's in that smoke? | 11alive.com; BioLab fire: Overnight chlorine spike, Atlanta residents warned of haze and odor | FOX 5 Atlanta
[20] https://cairntechnology.com/long-term-effects-chlorine-exposure/#:~:text=The%20long%2Dterm%20effects%20of%20chlorine%20exposure%20can%20include%20the,damage%2C%20which%20could%20be%20irreparable
[21] Conyers Georgia BioLab chemical fire: What's in that smoke? | 11alive.com

74.     Because agents like chlorine are designed to kill algae in pools and hot tubs, the chemicals have devasting effects when they enter aquatic ecosystems. Just as in 2004, there will likely be massive marine life die-offs in nearby water bodies.

75.     This environmental contamination will also pollute the properties of Plaintiffs and Class Members and may cause them to incur expensive cleanup costs.

76.     The 2024 fire is the culmination of Defendants' decades-long practice of negligence and apathy towards critical safety measures and handling of its toxic chemicals.

77.     And indeed, for years, residents have been growing increasingly concerned about their escalating exposure due to the hazardous chemicals eruptions consistently coming from the Conyers BioLab facility.

78.     Former firefighter and Atlanta resident Daniel Frye stated that "this is a grave situation," and added that he thinks "the plant should be closed…it's so close to adjacent population centers."[22]

79.     On Rockdale County's Facebook page, one commenter expressed their frustrations with BioLab's pattern of harm: "This facility is a known problem, and has been for years."[23]

80.     Other residents have noted that the Conyers BioLab facility is a danger that has been "hiding in plain sight for years."[24]

81.     Peter Stolmeier, a 15-year resident of Conyers, expressed deep concern over BioLab's dangerous track record. "Just about everyone I've spoken to locally or not agrees that

---

[22] Records: Ga. chemical plant had a history of fires and leaks (firerescue1.com)
[23] The Georgia chemical fire, explained: Why chlorine is in the air and what to do about it | Vox
[24] 'Pattern of negligence': a chemical plant fire in Georgia forces tens of thousands to take shelter | Georgia | The Guardian

factories can be dangerous, but three times in living memory is just too many for anyone…It's my hope lessons are learned this time for other facilities but that this one is never opened again."[25]

82.    As of this filing, over 5,600 residents have signed a petition to shut down the BioLab facility. The petition explains that this is "a fight for the health and safety of every citizen of Conyers, our children, our elderly, our families. It is a fight for the future of our environment and our community."[26]

83.    But just as Defendants repeatedly ignored the warning signs from their own facility, so too have they ignored the cries of the community.

84.    Plaintiffs now bring this action on behalf of themselves and the putative class to hold Defendants accountable for their persistent recklessness, and callous disregard for the health and safety of the Rockdale Community and its environment.

## CLASS ACTION ALLEGATIONS

48.    Plaintiffs seek relief on behalf of themselves and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), 23(b)(2), 23(b)(3) and 23(c)(4), Plaintiffs seek certification of a class defined as follows:

> All individuals who resided, owned property, worked or operated businesses within a 50-mile radius of 1700 Covington Highway, Conyers, Rockdale County, Georgia 30012 as of September 29, 2024, and were subject to the evacuation orders, shelter-in-place orders and/or shelter-in-place advisories issued as a result of the September 29, 2024 BioLab Conyers fire (the "Class Area").

49.    Excluded from the Class are Defendants, their legal representatives, assigns and successors, and any entity in which Defendants have a controlling interest. Also excluded is the

---

[25] ‘Pattern of negligence': a chemical plant fire in Georgia forces tens of thousands to take shelter | Georgia | The Guardian
[26] Petition · Shut Down the Bio Lab in Conyers, Georgia for Health and Environmental Safety - United States · Change.org

judge to whom this case is assigned and any member of the judge's immediate family and judicial staff.

50.     Plaintiffs hereby reserve the right to amend or modify the class definition with greater specificity or subclassing after having had an opportunity to conduct discovery.

51.     This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

52.     <u>Numerosity (Rule 23(a)(2))</u>: Consistent with Rule 23(a)(1), the members of the Class are so numerous that joinder is impractical. While the exact number of Class Members is unknown at this time, the proposed Class includes thousands of residents who were harmed by Defendants chemical explosions.

53.     <u>Commonality (Rule 23(a)(2)</u>: Consistent with Rule 23(a)(2), this action involves common questions of law and fact that predominate over any questions affecting individual Class members. The answers to these questions will be common to the class. The common questions include:

>    a.     Whether Defendants operated their chemical enterprise negligently, recklessly, intentionally or otherwise tortiously;
>
>    b.     Whether Defendants owed a duty of care to Plaintiffs and the Class;
>
>    c.     Whether the duty of care owed to the Class included the duty to protect Plaintiffs and the Class against unreasonable harm through exposures to unsafe and unnecessarily high levels of toxic chemicals;

d.      Whether Defendants breached their duty to warn Plaintiffs and the Class of and protect Plaintiffs and the Class from the health risks and consequences of exposure to toxic chemicals originating from their chemical explosions;

e.      Whether Defendants have exposed the properties belonging to Plaintiffs and Class Members to toxic chemicals;

f.      Whether Defendants have unreasonably interfered with the ability of Plaintiffs and the Class to use and enjoy their properties; and

g.      Whether Plaintiffs and the Class are entitled to relief and the nature of that relief.

54.    <u>Typicality (Rule 23(a)(3))</u>: Consistent with Rule 23(a)(3), Plaintiffs' claims are typical of those of the putative Class Members. Plaintiffs reside and works in the vicinity of the Defendants' chemical explosions, and brings claims based upon the same legal theories as those of the other Class Members. Like all Class Members, Plaintiffs sustained damages as a direct and proximate result of the same wrongful actions and omissions committed by Defendants. Plaintiffs' damages and injuries are typical of the damages and injuries of other Class Members, and Plaintiffs seek relief consistent with the relief sought by the Class.

55.    <u>Adequacy (Rule 23(a)(4))</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting environmental class actions on behalf of plaintiffs suffering personal injuries and property damage. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the Class.

56.     <u>Predominance of Common Questions (Rule 23(b)(3)</u>: The aforementioned common questions of law and fact, *see* ¶ 53, predominate over any questions involving individualized analysis. There are no fundamental questions of law or fact that are not common to members of the Class.

57.     <u>Superiority (Rule 23(b)(3)):</u> Plaintiffs and members of the Class have suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Most members of the Class likely would find the cost of litigating their individual claims to be prohibitive and will have no adequate remedy at law. Thus, absent a class action, members of the Class will continue to incur damages and Defendants' misconduct will proceed without remedy. Class treatment of common questions of fact and law is superior to multiple individual actions or piecemeal litigation because it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication. There is no impediment to the management of this action as a class action because the questions of fact and law are virtually identical for Plaintiffs and all Class members.

58.     <u>Injunctive Relief (Rule 23(b)(2)</u>: Class certification is also appropriate under Rule 23(b)(2). Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

59.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Strict Liability – Ultrahazardous Activity

60.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 59 as if fully set forth here.

61.     The storage and manufacture of extremely toxic and readily combustible chemicals is abnormally dangerous and cannot be made safe by the exercise of the utmost care. The explosion at Defendants' facility has caused, and continues to cause, emission of hazardous chemicals into the surrounding communities, which pose a high risk to Plaintiffs and Class Members.

62.     It is likely that the emissions of caustic chemicals will result in significant irritation, discomfort and injury to Plaintiffs and Class Members. This risk cannot be eliminated while such chemicals are entering populated areas.

63.     Defendants stored these chemicals in a way that made it likely the chemicals would combust and be emitted into a populated area. Defendants' storage practices and methods of operating their Conyers facility is inappropriate, unsafe, and unlawful; it has imposed an extraordinary health risk on the people living in the surrounding area, including increasing their risk of developing exposure-based illnesses, contaminating their properties, and unreasonably interfering with the use and enjoyment of their properties.

64.     The activities conducted by Defendants are exceedingly dangerous and offer little value to the surrounding community. Indeed, thousands of community members have called for Defendants' removal from Conyers.

65.     Further, it was and is unreasonable for the BioLab facility to be located in close proximity to the large population center of Conyers, Georgia.

66.     Because these activities are ultrahazardous, Defendants are strictly liable for any injuries proximately resulting from them.

67.     As a direct and proximate result of Defendants' ultrahazardous activities, Plaintiffs and Class Members were significantly exposed to toxic chemicals, and have suffered discomfort, inconvenience, injury, loss of use and enjoyment of property, emotional distress, economic loss, and diminution in property value.

68.     Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentional disregard for Plaintiffs' rights so as to warrant the imposition of punitive damages.

## SECOND CAUSE OF ACTION

### Negligence

68.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 59 as if fully set forth here.

69.     Each Defendant owed Plaintiffs and Class Members a duty to operate their chemical enterprise in a manner which would not cause Plaintiffs and Class Members injury or harm.

70.     Defendants owed Plaintiffs and Class Members a duty to use reasonable care in the manufacture and storage of chemicals at the BioLab Conyers facility.

71.     Defendants each negligently breached their duty of care by causing the chemicals in their Conyers facility to explode and/or ignite, and by releasing and allowing the release of these caustic chemicals into the environment, where they have exposed Plaintiffs and Class Members in and around their homes and places of work.

72.     Defendants owed Plaintiffs and Class Members a duty of reasonable care to prevent unreasonable harm and foreseeable risks stemming from the operation of their chemical facility.

73. Because of the foreseeable risk of contaminating the surrounding areas and exposing residents living nearby to toxic chemicals, Defendants had a duty to operate their facility in a manner which would prevent the chemicals on site from exploding and contaminating the community and environment.

74. Defendants each negligently breached their duty of reasonable care by, among other things:

      a. Emitting dangerous volumes of harmful chemicals into the environment;

      b. Failing to employ safe methods to adequately control their chemical enterprises and ensure explosions, ignitions, and runaway chemical reactions did not occur

      c. Failing to ensure the adequacy and operation of sprinklers at their Conyers facility;

      d. Failing to ensure that chemicals were stored in a manner that would prevent them from coming into contact with water;

      e. Failing to properly alter chemical storage practices at the Conyers site after numerous prior explosions at the Conyers facility provided notice of the high risk of danger;

      f. Failing to impose corporate policies and procedures to prevent ignitions, explosions, and runaway chemical reactions from happening;

      g. Failing to store hazardous materials in such a way as to avoid their contact with populated areas; and

      h. Failing to have or implement a responsible emergency response plan that would minimize and contain the release of toxic chemicals into the environment.

75. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members were exposed to toxic chemicals, and have suffered discomfort, injury, inconvenience, loss of use and enjoyment of property, emotional distress, economic loss, property damage, and diminution in property value.

76.     Defendants consciously and deliberately pursued a common plan and design to conduct reckless activities and are therefore jointly liable to Plaintiffs and Class Members.

77.     Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentional disregard for Plaintiffs' rights so as to warrant the imposition of punitive damages.

## THIRD CAUSE OF ACTION
### Private Nuisance
### O.C.G.A. §§ 41-1-1; 41-1-2; 41-1-4

69.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 59 as if fully set forth here.

78.     A nuisance is "anything that causes hurt, inconvenience, or damage to another and the fact that the act done may otherwise be lawful shall not keep it from being a nuisance."[27]

79.     A private nuisance "may injure either a person or property, or both, and for that injury a right of action accrues. . . ."[28]

80.     Defendants have substantially and unreasonably caused the contamination of real property surrounding the Conyers facility, which has interfered with Plaintiffs' and Class Members' ability to use and enjoy their property.

81.     Defendants' unreasonable use of their property at the Conyers facility, culminating in the explosion of the Conyers facility, has substantially and unreasonably interfered with the rights of Plaintiffs and Class Members to use and enjoy their property, causing them to suffer injuries, inconvenience, emotional distress, and diminution in property value.

---

[27] O.C.G.A. § 41-1-1.
[28] O.C.G.A. § 41-1-4.

82.     Plaintiffs have suffered specific injuries as a result of Defendants' tortious conduct, including harmful and offensive contact to their bodies, pollution of their property and the diminution in value of their homes.

83.     Defendants' improper manufacture, storage, discharge, and ignition of highly caustic and combustible chemicals constitutes a private nuisance. Defendants' nuisance has directly and proximately caused Plaintiffs to suffer loss of use and enjoyment of their property, discomfort, injury, inconvenience, emotional distress, economic loss and diminution in property value.

84.     Defendants consciously and deliberately pursued a common plan and design to conduct reckless activities and are therefore jointly liable to Plaintiffs and Class Members.

85.     Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentional disregard for Plaintiffs' rights so as to warrant the imposition of punitive damages.

## FOURTH CAUSE OF ACTION

### Trespass

70.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1 through 59 as if fully set forth here.

86.     Defendants, through their actions herein alleged, caused hazardous materials to enter and contaminate Plaintiffs' property. Defendants intentionally, knowingly, and negligently discharged highly toxic chemicals onto Plaintiffs' and Class Members' real property.

87.     At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' property rights.

88.     Defendants' intentional, knowing, and negligent discharge of highly toxic chemicals into Plaintiffs' and Class Members' property has interfered with Plaintiffs' and Class Members' rights to use and enjoy their property and constitutes a trespass and continuing trespass.

89.     Defendants' trespass has substantially impaired Plaintiffs' rights of use and enjoyment of their property and has caused Plaintiffs to suffer discomfort, injury, inconvenience, emotional distress, economic loss and diminution in property value.

90.     Defendants consciously and deliberately pursued a common plan and design to conduct reckless activities and are therefore jointly liable to Plaintiffs and Class Members.

91.     Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentional disregard for Plaintiffs' rights so as to warrant the imposition of punitive damages.

## DAMAGES SOUGHT BY THE CLASS

92.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

93.     Plaintiffs and Class Members have sustained and will continue to sustain damages to their property and health as a result of Defendants' actions. As a result, Plaintiffs and Class Members seek monetary damages for each violation of the First through Fourth Claims for Relief. In particular, Plaintiffs and Class Members seek (i) monetary damages reflecting the cost to remediate Class Members' property of the contamination caused by Defendants' conduct or, in the alternative, to compensate Class Members for the diminution in value of their property caused by Defendants' conduct; (ii) monetary damages to compensate Class Members for the loss of the use and enjoyment of their properties caused by Defendants' conduct; (iii) monetary damages for the

diminution of the value of the Plaintiffs' property, and (iv) monetary damages to compensate Class Members for the loss of quality of life caused by Defendants' conduct.

94.     Plaintiffs and the Class also seek damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks posed by chlorine gas, TCCA, and other toxic chemicals emanating from Defendants' facility that have contaminated the Class Area.

95.     Further, because Defendants' acts were done maliciously, oppressively, deliberately, and in reckless disregard of Plaintiffs and the Class, Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

a.     For an Order certifying the Class, as defined above, and appointing Plaintiffs and their Counsel to represent the Class;

b.     For damages, including compensatory, consequential, punitive, and exemplary damages, in an amount determined to be just and reasonable

c.     For the creation of a biomonitoring program tailored to the exposure risks arising from Defendants' release of toxic chemicals into the Class Area;

d.     For an award of attorney's fees, costs, and litigation expenses, as allowed by law;

e.     For prejudgment interest on all amounts awarded;

f.     For injunctive and declaratory relief, as allowed by law; and

g.     Such other and further relied as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated:  October 4, 2024.                    Respectfully submitted,

*/s/ N. Kirkland Pope*
N. Kirkland Pope
Georgia Bar No. 584255
Caroline G. McGlamry
Georgia Bar No. 230832
**POPE, McGLAMRY, KILPATRICK,**
**MORRISON & NORWOOD, P.C.**
3391 Peachtree Road, N.E., Suite 300
Atlanta, GA  30326
(404) 523-7706
Fax (404) 524-1648
efile@pmkm.com

James Bilsborrow
**WEITZ & LUXENBERG, PC**
700 Broadway
New York, NY 10003
Phone: (212) 558-5500
jbilsborrow@weitzlux.com